**[J-58-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

PRIVATE PROPERTIES, LLC, A       :    No. 90 MM 2020
PENNSYLVANIA LIMITED LIABILITY    :
COMPANY, CHESTER PROPERTIES,    :
LLC, A PENNSYLVANIA LIMITED      :
LIABILITY COMPANY, AND THE       :    SUBMITTED: June 4, 2020
PENNSYLVANIA RESIDENTIAL OWNERS   :
ASSOCIATION, A PENNSYLVANIA NON-   :
STOCK NON-PROFIT ON BEHALF OF ALL   :
SIMILARLY SITUATED PARTIES,      :
                        :
         Petitioners         :
                        :
.                           :
      v.                    :
                        :
                        :
TOM WOLF, GOVERNOR OF THE      :
COMMONWEALTH OF PENNSYLVANIA    :
AND JOSH SHAPIRO, ATTORNEY      :
GENERAL OF THE COMMONWEALTH OF   :
PENNSYLVANIA,            :
                        :
        Respondents      :

**DISSENTING STATEMENT**

**JUSTICE WECHT**                              **FILED: July 31, 2020**

Governor Tom Wolf has issued consecutive executive orders, pursuant to his emergency powers under the Emergency Code,[1] that bar until further notice landlords from evicting residential tenants for defaulting on their rent obligations or overstaying the

---

[1] *See* Act of Nov. 26, 1978, P.L. 1332, No. 323, *codified as amended at* 35 Pa.C.S. §§ 7301, *et seq.*

terms of their residential leases.[2]  Acting *per curiam*, this Court, with only Chief Justice Saylor noting dissent, deemed Petitioner-landlords' constitutional challenge to the Governor's authority to issue that order worthy of our rarely-exercised King's Bench jurisdiction and of a sharply expedited briefing schedule.[3]  Astonishingly, more than two months later, a majority of this Court's members, again speaking *per curiam*, has decided that the case no longer warrants review at all.  It appears that several of my colleagues simply have changed their minds.

When this Court took jurisdiction and directed briefing, we signaled our intention to review and decide the legal merit of a constitutional dispute of enormous consequence to Petitioners, hundreds or thousands of other landlords, and likely thousands of tenants who are behind on their rent because of continuing COVID-19-related hardships.[4]  In over two months since, none of the material circumstances that frame the constitutional questions presented have changed in any way that impairs our ability to analyze

---

[2]     *See Order of the Governor of the Commonwealth of Pennsylvania for Staying the Notice Requirements for Certain Actions Related to the Dispossession of Property* (May 7, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/05/20200507-TWW-dispossession-of-property-order.pdf (hereinafter "May Order"); *Order of the Governor of the Commonwealth of Pennsylvania Staying Notice Requirements for Specified Actions Related to the Dispossession of Property* (July 9, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/07/20200709-TWW-eviction-order.pdf (hereinafter "July Order").

[3]     *See* Order, *Private Properties, LLC v. Wolf*, 58 MM 2020 (May 27, 2020) (*per curiam*; Saylor, C.J., noting dissent).

[4]     No tenants or tenant groups are parties in this action.  However, a number of *amici curiae* have submitted impassioned briefs on behalf of the tenants.  *Amici curiae* collectively submitted three briefs.  One each for the Cities of Pittsburgh and Philadelphia, and a third on behalf of Action Housing, Neighborhood Legal Services, Community Justice Project, Senior Law Center, Pittsburgh United, Pittsburgh Union of Regional Renters, and Tenant Union Representative Network.

Petitioners' claims as originally presented. There have been *no* relevant surprises. Meanwhile, to all outside appearances the case has languished for nearly two months, while thousands of Pennsylvanians live with uncertainty as to the status—and in some instances the fate—of their core businesses and the roofs over their heads. The Governor's authority to have put them in that position, however well-intentioned, remains an open question. To dismiss this case as improvidently granted, implying that this Court simply erred in granting King's Bench review to begin with, is to leave roiling uncertainty in our wake as we drift out of sight. I dissent.

To understand the gravity of this Court's decision to abscond, it is necessary first to review a series of judicial and executive orders that have issued over the course of the Spring and Summer of this year of our pandemic, 2020. The scourge of COVID-19 ("COVID"), of course, has sent shockwaves through all levels of Pennsylvania's government. COVID's arrival in our Commonwealth—as it has in at least the vast majority of states in our nation—precipitated a flurry of executive orders. In Pennsylvania, these have descended from the Governor's initial, since-renewed Proclamation of a Disaster Emergency pursuant to the Emergency Code.[5] This Court has considered and rejected a number of statutory and constitutional challenges to those orders.[6]

---

[5] *See Proclamation of Disaster Emergency* (March 6, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf; *Amendment to Proclamation of Disaster Emergency* (June 3, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/06/20200603-TWW-amendment-to-COVID-disaster-emergency-proclamation.pdf.

[6] *See Wolf v. Scarnati*, 104 MM 2020, ___ A.3d ___, 2020 WL 3567269 (Pa. July 1, 2020); *Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020); *Civil Rights Defense Firm, P.C. v. Wolf*, 226 A.3d 569 (Pa. 2020) (*per curiam*) (dismissing as moot a challenge

This particular challenge was initiated shortly after the Governor issued the May Order, on May 7, 2020,[7] which effectively barred evictions under the Landlord and Tenant Act of 1951 ("LTA") and the Manufactured Home Community Rights Act ("MHA").[8] Both Acts impose strict notice requirements upon lessors seeking to evict lessees from leased property before they may commence an action to dispossess the lessee of his or her rented home. These provisions ensure that tenants have sufficient notice to protect their rights, cure their default, or leave the premises in an orderly fashion without being subject

_____

to the Governor's authority to regulate legal service providers and denying jurisdiction as to other challenges).

[7]    Henceforth, all dates mentioned in this Opinion fall in the year 2020 unless otherwise specified.

[8]    In relevant part, the Governor's May Order provided:

> Commencing on May 11, 2020, the notice requirements mandated by the Landlord and Tenant Act of 1951[, Act of April 6, P.L. 69, No. 20, *codified as amended at* 68 P.S. §§ 250.101, *et seq.*,] and the Manufactured Home Community Rights Act[, Act of Nov. 24, 1976, P.L. 1176, No. 261, *codified as amended at* 68 P.S. §§ 398.1, *et seq.*,] are stayed for 60 days, thereby tolling the ability to commence the timelines necessary for the initiation of eviction proceedings. All eviction proceedings requiring compliance with the [LTA] and the [MHA] cannot commence for 60 days until July 10, 2020. All eviction timelines must be computed with a start date of July 10, 2020, at which point any previously delivered [LTA] and [MHA] notices will be deemed delivered and any eviction proceedings may commence. The eviction proceedings requiring compliance with the [LTA] and the [MHA] may proceed from that point forward in the normal course of action.

May Order at 3. As set forth below, the Governor renewed this Order, which was set to expire on July 10, in nearly identical form by issuing his July Order. Aside from updating the relevant dates set forth in the May Order, the only change was to revise the end of the first sentence by adding "residential" as a modifier of the phrase "eviction proceedings." *Compare* May Order at 3 § 2 *with* July Order at 3 § 2. In short, the Governor did nothing more than narrow (or perhaps clarify) the intended class of protected tenants. This did not in any way obviate or change the terms of the constitutional questions presented.

to self-help, litigation by ambush, or sudden, unannounced removal by official compulsion.

Citing his Emergency Code authority and the Secretary of Health's discrete authority under the Disease Prevention and Control Law of 1955 ("DPCA"),[9] and noting that "the movement and/or displacement of individuals residing in Pennsylvania from their homes or residences . . . constitutes a public health danger to the Commonwealth," May Order at 2, the Governor ordered that, during the period from May 11 until July 10, LTA and MHA notice requirements would be stayed, "thereby tolling the ability to commence the timelines necessary for the initiation of eviction proceedings." *Id.* at 3; *see supra* n.8. Put simply, the Governor effectively suspended eviction proceedings for two months. On May 21, the Governor issued an Amendment to the May Order limiting the scope of the evictions presented to those involving nonpayment of rent or overstaying the duration of the tenant's lease.[10]

On May 12, one day after the May Order took effect and before the May 21 amendment, Petitioners filed their Application for Extraordinary Relief in this Court.

---

[9]     *See* Act of April 23, 1956, P.L. 1510, No. 500, *codified as amended at* 35 P.S. §§ 521.1, *et seq.* The Governor also cited applicable sections of the Administrative Code delineating the Secretary of Health's power generally to protect the health and safety of Pennsylvania citizens. *See* May Order at 1 (citing 71 P.S. §§ 532(a), 1403(a)).

[10]    See *Amendment to the Order of the Governor of the Commonwealth of Pennsylvania for Staying the Notice Requirements for Certain Actions Related to the Dispossession of Property* (May 21, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/05/20200521-TWW-amendment-to-dispossession-of-property-order.pdf.

Therein, they asked us to exercise King's Bench jurisdiction[11] and to invalidate the May Order on the basis that the Governor's action had violated the separation of powers assured by the Pennsylvania Constitution and/or substantive due process principles. *See* Petition for Extraordinary Relief Pursuant to the Court's King's Bench Jurisdiction, ¶¶16-36. This Court responded by requiring Respondents, the Governor and the Attorney General, to file their Answer on May 18, the fourth business day thereafter.

On May 27, this Court determined by *per curiam* order, Chief Justice Saylor noting dissent, that Petitioners' challenge warranted an exercise of this Court's King's Bench jurisdiction.[12] Mindful of the urgency and import of the questions presented, this Court

---

[11]    Our King's Bench jurisdiction, which predates even our Nation's independence, is codified in our Judicial Code as follows:

> The Supreme Court shall have and exercise the powers vested in it by the Constitution of Pennsylvania, including the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722. The Supreme Court shall also have and exercise the following powers:
>
> > (1) All powers necessary and appropriate in aid of its original and appellate jurisdiction which are agreeable to the usages and principles of law.
> >
> > (2) The powers vested in it by statute, including the provisions of this title.

42 Pa.C.S. § 502; *see Carpentertown Coal & Coke Co. v. Laird*, 61 A.2d 426, 428-29 (Pa. 1948); *see generally* Hon. William S. Stickman, IV, *The King's Bench Powers*, in THE SUPREME COURT OF PENNSYLVANIA: LIFE AND LAW IN THE COMMONWEALTH, 1684-2017, at 26-39 (John J. Hare, ed., 2018).

[12]    In full, our *Per Curiam* Order granted King's Bench jurisdiction and ordered briefing on the following questions:

directed briefing on a schedule as tight as would be practicable in any matter. Specifically, our Order, which issued on a Wednesday, required Petitioners to file their brief no later than noon the following Monday, June 1—and granted Respondents only three business days thereafter to respond, setting a noon deadline on June 4. This Court also accepted numerous briefs by *amici curiae*, each of which thoughtfully fleshed out the legal issue and/or the interests at stake. *See supra* n.4.

While the Governor was attempting to minimize the harm caused by the pandemic, this Court had not been standing idly by. Mindful of the foreseeable risk of disease transmission inside bustling courthouses and courtrooms, and given the face-to-face contact that litigation traditionally entails, on March 18, this Court declared the Pennsylvania courts generally closed to the public from March 19 through April 3. We also ordered that no judicial agents or employees would be permitted to act upon eviction orders.[13] On April 1, we entered a new order extending the shutdown through April 30, thus renewing our prohibition of eviction enforcement by judicial employees.[14]

---

1) Whether the Executive Order of May 7, 2020 Violates the Separation of powers Doctrine;

2) Whether the Executive Order of May 7, 2020 Violates the Property Owners' Right to Substantive Due Process.

Order, *Private Properties, LLC v. Wolf*, 90 MM 2020 (May 27, 2020) (*per curiam*).

[13] *See In Re: General Statewide Judicial Emergency*, 531 & 532 Judicial Administration Docket (Mar. 18, 2020), http://www.pacourts.us/assets/files/page-1305/file-8634.pdf.

[14] *See In Re: General Statewide Judicial Emergency*, 531 & 532 Judicial Administration Docket (Apr. 1 2020), http://www.pacourts.us/assets/files/page-1305/file-8846.pdf.

Again on April 28, we extended the statewide judicial emergency through June 1.[15] But this time we made clear that "the statewide suspension of procedures related to the dispossession of property," *i.e.*, evictions and foreclosures, would end on May 11.  *See Emergency Order*, 531 & 532 Administrative Docket (April 28, 2020), *supra* n.14, at 12. While we lifted our statewide suspension, we expressly authorized President Judges of the lower courts to issue their own emergency declarations and take such protective measures as they saw fit in light of local conditions.  *See id.* at 3.

It was against *this* backdrop that the Governor issued the May Order four days before our Order was to expire, and it is easier to infer the Governor's intent within that framework.  In short, when it became clear that this Court no longer deemed it necessary to suspend eviction enforcement, delegating any such restrictions to the discretion of the lower courts, the Governor issued his May Order, extending the prohibition on eviction enforcement by different means.  Whether the Governor has actual authority to issue such an order, or whether his order impermissibly infringed this Court's broad and exclusive supervisory authority over the administration of the courts under Article V, Section 10(c), of our Constitution[16] or otherwise violated Petitioners' due process rights,

---

[15]    *See In Re: General Statewide Judicial Emergency*, 531 & 532 Judicial Administration Docket (Apr. 28, 2020), http://www.pacourts.us/assets/files/page-1305/file-9158.pdf.

[16]    Section 10(c) provides:

The Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts, justices of the peace and all officers serving process or enforcing orders, judgments or decrees of any court or justice of the peace, including the power to provide for assignment and reassignment of classes of actions or classes of appeals among the several courts as the needs of justice shall require, and for admission to the bar and to practice of law, and the administration of all

is the subject of the instant action.  And as noted above, on May 27, we signaled our intent to resolve these important questions by exercising King's Bench jurisdiction.[17]

Meanwhile, the clock was ticking on the Governor's May Order, which was set to expire on July 10.  On July 9, a little over a month after the parties to this action completed their briefing on our expedited schedule, the Governor issued his July order, which renewed his prior measures to prevent the dispossession of property by eviction.[18] Among minor differences with no obvious bearing on the broad dispute before us, the July Order cited only the Emergency Code as authority, omitting to mention the Secretary

---

courts and supervision of all officers of the Judicial Branch, if such rules are consistent with this Constitution and neither abridge, enlarge nor modify the substantive rights of any litigant, nor affect the right of the General Assembly to determine the jurisdiction of any court or justice of the peace, nor suspend nor alter any statute of limitation or repose.  All laws shall be suspended to the extent that they are inconsistent with rules prescribed under these provisions. . . .

PA. CONST. art. V § 10(c).

[17] Also on May 27, we issued an order officially ending the statewide judicial emergency, effective June 1, 2020.  Therein, we continued to delegate discretion to the lower courts to maintain or declare emergencies as they deemed fit.  *See In re: Statewide Judicial Emergency*, 531 & 532 Judicial Administration Docket (May 27, 2020), http://www.pacourts.us/assets/files/page-1305/file-9376.pdf.

[18] The May Order and subsequent July Order included various provisions limiting foreclosure proceedings under The Loan Interest and Protection Law, Act of Jan. 30, 1974, P.L. 13, No. 6, *codified as amended at* 41 P.S. §§ 101, *et seq.* ("Act 6"), and the Homeowners Emergency Assistance Act, Act of Dec. 23, 1983, P.L. 385, No. 91, *codified as amended at* 35 P.S. §§ 1680.401c, *et seq.* ("Act 91").  While a merits ruling on Petitioners' challenge might affect the validity of those provisions if Petitioners' LTA and MHA claims were to lead to this Court's invalidation of the entire Order as a constitutional matter, they do not feature anywhere in Petitioners' arguments.  Petitioners assiduously limit their challenge to those restrictions that affect their rights of possession and recovery under the LTA and MHA, and express no interest in the operation of the May and July orders with respect to mortgage foreclosures.

of Health's discrete authority under the Administrative Code and the DPCA; and, unlike the May Order, the July Order expressly limited the scope of its prohibition to *residential* evictions. *See supra* n.8. But in all relevant particulars, the July Order preserved the same condition relative to Petitioners' interests that the May Order had imposed. Like the May Order, the July Order bars two broad categories of evictions to minimize community spread of COVID. The lone change to Section 2 of the Order barring tenant evictions under the LTA and MHA in no way affected the gravamen of Petitioners' argument.[19]

Perhaps for that reason, the parties did not venture to file any additional documents addressing the July Order, despite the pendency of this action and the opacity of this Court's then-ongoing deliberative process. But we also did not issue any order directing or inviting the parties to do so, a conspicuous omission given that we not infrequently will do precisely that when we believe that changed circumstances, briefing deficiencies, or other prudential concerns require further advocacy. I can only speculate as to why the parties did not elect to supplement their previous submissions on their own initiative—an especially interesting question with respect to Respondents, who could have preserved the *status quo* they presumably prefer by successfully arguing that the July Order mooted Petitioners' challenge by replacing the by-then expired May Order.[20]

---

[19] The July Order, like the May Order, also contained provisions not presently at issue that related to notice requirements under Acts 6 and 91, both of which govern in the context of mortgage foreclosure. The July Order's only non-trivial departures from the substance of the May Order effectively were limited to Acts 6 and 91, which, as set forth *supra* n.18, do not bear upon the LTA and MHA challenges presented in this case and warrant no further discussion.

[20] *See, e.g., Commonwealth, Dept. of Envtl. Protection v. Cromwell Twp., Huntingdon Cty.*, 32 A.3d 639, 651 (Pa. 2011) (noting that this Court will not decide moot questions, which are those in which a party's stake in the outcome has been obviated by changes in the facts or law; here, viewed formalistically, the expiration of the May Order

In any event, if this Court detected some previously unnoticed flaw or believed that circumstances had changed in a way that called into question the justiciability of the instant challenge on any basis, at the very least, having already deliberated for nearly two months, we could have granted the parties an opportunity to address the concern before dismissing a case that this Court already had deemed so extraordinary as to warrant bypassing the ordinary course of litigation and taking immediate jurisdiction. While we address jurisdictional defects *sua sponte* when we identify them, other grounds for deeming a case non-justiciable, such as standing and ripeness, typically are waived unless raised by the parties. *See Rendell v. Pa. State Ethics Comm'n*, 983 A.2d 708, 717-18 (Pa. 2009). And our King's Bench authority brings with it the prerogative to overlook irregularities in the posture or presentation of a case of great public importance. *See In re Bruno*, 101 A.3d 635, 669 (Pa. 2014) ("The exercise of King's Bench authority is not limited by prescribed forms of procedure or to action upon writs of a particular nature; the Court may employ any type of process or procedure necessary for the circumstances."). Moreover, even without invoking our extraordinary King's Bench authority, when this Court is confronted with the prospect that an issue of great public importance is capable of repetition and evading review, we may and sometimes do

eliminates Petitioners' interest as stated in their Application, because the May Order no longer affects their interests). Perhaps Respondents did not believe that a mootness argument would prevail because the underlying question had not materially changed. Or perhaps Respondents, burdened as they are with addressing pandemic-related matters on numerous fronts, *want* this Court to settle this important question of executive authority in the interests of clarity, given that virtually every significant COVID-related action undertaken by the Governor has been subject to aggressive legal challenges. That the parties declined to address the July Order perhaps is most consistent with their belief that the July Order did not materially affect this Court's ability to decide the question presented according to the briefing we already had in hand. I certainly believe that is the case.

overlook justiciability concerns to resolve the issue. *See, e.g., Pub. Def.'s Office of Venango Cty. v. Venango Cty. Court of Common Pleas*, 893 A.2d 1275, 1279-80 (Pa. 2006).

What is so dispiriting about this dismissal is that this Court has resolved nothing, inviting commencement of another materially identical challenge. The July Order remains in effect until August 31. And as of this writing, the rate of new infections in Pennsylvania has been increasing steadily for over a month, standing now at nearly the same level it was at the time of the May Order, and continuing to increase. It is half-again as high as it was when the Governor entered the July Order.[21] While we cannot know what the Governor will do in the future, present conditions differ only modestly from those that prompted the Governor's May and July Orders. Petitioners and others similarly situated have every reason to speculate that the Governor will extend the July Order or issue an order to similar effect before the July Order's August 31 expiration.[22] Thus, it is all but certain that some party or parties will bring a similar if not materially identical challenge to the Commonwealth Court in its original jurisdiction,[23] restarting the clock on this urgent constitutional dispute. And since the case will be heard in the Commonwealth Court's original jurisdiction, the losing party will be entitled to appeal the ruling to this Court as of

---

[21]     *See Pennsylvania Coronavirus Map and Case Count*, N.Y. TIMES (July 29, 2020, 2:08 P.M.), https://www.nytimes.com/interactive/2020/us/pennsylvania-coronavirus-cases.html.

[22]     Even if the expiration of the July Order marks the end of the Governor's eviction bar, August becomes yet another month separating any number of landlords from taking possession of their property pursuant to an executive order the constitutionality of which remains contested and unresolved.

[23]     *See* 42 Pa.C.S. § 761(a)(1).

right,[24] all but ensuring still further delay. All things remaining equal, in the coming months we have every reason to anticipate that the same constitutional challenges we accepted jurisdiction to entertain months ago will return. The only question is how far down the road we have kicked the can.

Worse still, any difficulties arising from the Governor's replacement of one emergency order of relatively short duration with the next, as occurred during the pendency of this case, are likely to recur. One must ask whether Pennsylvania landlords will find themselves powerless as a class *ever* to secure a definitive ruling as to whether the Governor has authority to bar judicial eviction proceedings in the first instance so long as he continues to issue his orders in six- to eight-week increments.

The Governor took precipitous action that has impaired the business interests and property rights of Petitioners and many other landlords across this Commonwealth. Petitioners, their rights impaired in a most immediate sense, invited this Court to exercise our King's Bench jurisdiction, an invitation that this Court accepted after due deliberation. We then directed briefing of two discrete constitutional issues on a schedule that reflected a clear sense of urgency, one which surely led multiple attorneys to work through the weekend and deep into the evenings. Two months later, without explanation, this Court abruptly washes its hands of the whole affair, while uncertainty as to the constitutionality of the Governor's actions persists. For all the good we have done, this Court at least might have diverted Petitioners to the Commonwealth court two months ago by declining to take jurisdiction in the first place.

---

[24]     *See* 42 Pa.C.S. § 723(a).

To decide the constitutional questions before us would affect the economic interests of thousands of individuals, be they landlords or tenants, and hundreds or thousands of small businesses. The potential outcome is beside the point. As Justice Baer once aptly wrote: "The question now before us is not what a majority of this Court would decide, but whether it will undertake its normal comprehensive and thoughtful process, and decide something on this important issue." *Commonwealth v. Roby-Spencer*, 934 A.2d 693, 695 (Pa. 2007) (Baer, J., dissenting from an order dismissing the case as improvidently granted). Today, the Court answers, "No." But not to rule upon the question is, in effect, to rule against Petitioners, at least for weeks if not months to come.

I discern no practical, institutional, or jurisprudential benefit to dismissing this case so late in its development—and much to commend its prompt decision by this Court. In taking King's Bench jurisdiction, we correctly signaled that this case warranted extraordinary treatment. We were right to take the case then, and we would do right to decide it now.

It beggars belief that after the passage of two months, this Court has declined to address two focused, ripe, and emergent constitutional questions of consequence to so many. And the Court does so without any explanation. Petitioners and similarly situated landlords deserve more. Tenants suffering economic hardship in a state of enduring confusion deserve more. The Pennsylvania bench and bar, and the Governor himself, deserve more.

Someone must answer the difficult constitutional questions this case presents. If not us, then who? If not now, when?